UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MARY SHEPPARD,                                        CIVIL NO. 04-4145 MJD/AJB

                    PLAINTIFF,
                                                     REPORT AND RECOMMENDATION
                                                     ON PARTIES' CROSS-MOTIONS FOR
V.                                                   SUMMARY JUDGMENT

JO ANNE B. BARNHART, COMMISSIONER
OF SOCIAL SECURITY,

                    DEFENDANT.

_____

Jennifer G. Mrozik, Esq., for Mary Sheppard.

Lonnie F. Bryan, Esq., Assistant United States Attorney, for the Commissioner.

_____


I.      INTRODUCTION

        Plaintiff Mary Sheppard (Sheppard) disputes the unfavorable decision of the Commissioner of

Social Security Agency (Commissioner) denying her claim for a period of disability and child's

insurance benefits under Title II of the Social Security Act.  This matter is before the court, United

States Magistrate Judge Arthur J. Boylan, for a report and recommendation to the district court on the

parties' cross motions for summary judgment.  *See* 28 U.S.C. § 636 (b)(1) and Local Rule 72.1.

Based on the reasoning set forth below, this court **recommends** that Sheppard's Motion for Summary

Judgment [Docket No.18] be **granted** and that the Commissioner's Motion for Summary Judgment

[Docket No. 21] be **denied**.

## II.   PROCEDURAL HISTORY

Sheppard protectively filed for Childhood Disability Benefits (CDB), under 20 C.F.R.

§404.350, on May 11, 1999 (based on her mother's employment record) and on June 1999 (based on

her father's employment record).  (T. 91-94.)  Sheppard had previously established disability on July

15, 1974.  (T. 190.)  On April 26, 1976, the agency issued a cessation of disability statement,

concluding that Sheppard's medical condition had improved enough that she was no longer disabled

under the regulations.  (T. 191.)  This determination was based on an examination completed on April

12, 1976.  (*Id*.)  Disability payments were discontinued in June 1976.  (*Id.*)  On May 11, 1992,

however, Administrative Law Judge (ALJ) Gilbert Martinez reopened the file and determined that

Sheppard was disabled as of September 12, 1989.  (T. 27-29.)  Sheppard currently receives SSI

disability benefits based on the May 11, 1992 decision.  In order for Sheppard to qualify for Childhood

Disability Benefits, her current disability application, she must demonstrate continuing disability from age

22 until the present.  20 C.F.R. §404.350.  She has been determined to be disabled from July 1, 1974

through August 1, 1977 and again from September 12, 1989, through the present.  Thus, the relevant

period that she must demonstrate disability in order to qualify for CDB is the period of August 1, 1977

through September 12, 1989 (the "relevant period").

Sheppard's applications were denied initially[1] (T. 35-40) and on reconsideration (T. 71-

_____

[1]      Sheppard's application based on her mother's social security number was initially
denied based on the doctrine of *res judicata.*  (T. 35-36.)  The agency determined that a prior decision

77).  Sheppard requested and received a hearing before an ALJ.  On October 12, 2001, a hearing was

held before ALJ Diane Townsend-Anderson.  (T. 15, 78.)  Following the hearing, the ALJ issued an

opinion denying benefits.  (T. 22.)  ALJ Townsend-Anderson determined that for the relevant time

period, Sheppard could have performed jobs that were in significant number within the region.  (T. 23.)

Accordingly, the ALJ concluded that Sheppard failed to satisfy the requirements of continuing disability

under the criteria for Childhood Disability Benefits.  (*Id*.)  The Appeals Council denied review, thus

making the ALJ's decision the final decision of the Commissioner.  (T. 8.)  Sheppard now appeals the

Commissioner's decision to the district court.  **III.**    **FACTUAL BACKGROUND AND MEDICAL**

**HISTORY**

Sheppard was born on October 1, 1952.  (T. 91.)  She did not finish high school, but has

received her GED.  (T. 132.)  Sheppard has been diagnosed with "schizophrenia, shizo-affective type,

excited," which was later changed to a diagnosis of "manic-depressive, psychosis, manic type."  (T.

310.)  She has also been diagnosed with a chemical dependency disorder and she has undergone

treatment for chemical dependency several times, based on abuse of alcohol and marijuana.  (T. 317,

324.)  She has not used alcohol or marijuana since 1988.  (T. 352, 1121.)

Sheppard was first admitted to St. Mary's Hospital in Minneapolis, on December 6, 1969 for

agitation, tension, and uncontrolled hostility.  (T. 231.)  She was admitted through a court order

─────────────────────

of medical improvement on May 12, 1976, prevented the agency from revisiting the issue of continuous
disability, as required to be eligible for Childhood Disability Benefits.  (T. 36.)  The agency, however,
later denied both of Sheppard's applications on the basis that the there was an absence of any
significant medical records from the relevant time period that would substantiate her claim of disability.
(T. 37, 39.)

obtained by her parents who claimed that she was exhibiting irrational behavior.  (*See* T. 230.)  She

was diagnosed with Manic-depressive episode, manic type.  (T. 232.)  She underwent several electro-

shock therapy sessions during her treatment.  (T. 237, 422.)  By August 26, 1971, she had been

hospitalized five times for exhibiting inappropriate behavior related to manic depressive disease.  (T.

244.)  Although she would improve during each stay at the hospital, after being released from

treatment, she would soon return in the same agitated, hostile state.  (*See* T. 231, 237, 239, 244, 246.)

Shortly after being admitted to St. Mary's on June 7, 1973, Sheppard was transferred to another

hospital.  (T. 246.)  According to the report, Sheppard continued to show agitated, restless behavior

and began experiencing delusional thoughts that she was not getting enough oxygen and her body was

turning white.  (*Id*.)  She exhibited hostile and paranoid thinking.  (*Id*.)   She was transferred to another

institution after it was determined that she should be treated in a closed unit.  (*Id*.)

She was committed to Anoka State Hospital (ASH) several times in the early 1970s, diagnosed

with Manic Depressive Illness, manic type.  (T. 261-69.)  In an intake interview, completed on

February 2, 1971, the social worker denied Sheppard admittance to the Adolescent Treatment Center

because of her difficulty in getting along with others in the group home where she resided, her inability

to adjust to varying living arrangements, and her considerable psychiatric treatment as both an inpatient

and outpatient.  (T. 296-97.)

In 1972, Social Worker Mary Kay Windels, in a ASH commitment report, described

Sheppard as exhibiting "signs of increased emotional instability."  (T. 284.)  Windels explained that

Sheppard had been acting very erratically, noting that she had moved residences three times and "[a]t

each placed she stayed, the owners had reported to [Windels] that [Sheppard] was angry, aggressive,

and in one instance, violent." (T. 284.)  She also explained that Sheppard had been calling the police

and Emergency Social Services almost nightly and that she had such "screaming fits over the phone . . .

[that she] had been kicked out of Synder's Drug Store." (*Id*.)  She stated that because Sheppard's

"hostility is uncontrolled," "[i]f anyone tries to restrain or control her, she becomes hysterical and

verbally and physically abusive." (*Id*.)  Windels concluded that Sheppard "roams the street at night and

is a danger to herself and others." (*Id*.)  ASH declined to commit Sheppard unless she first tried

informal admission and then refused to stay.  (T. 279.)  Sheppard voluntarily admitted herself on May

18, 1972.  (T. 278.)  When Sheppard was discharged, four days after admission, it was noted that her

response to treatment had been very poor, her prognosis was negative, and that she had "complained

continuously during the waking hours, . . . became angry during a confrontation, and left the grounds

angrily." (T. 278.) She was subsequently committed by Hennepin County.  (T. 270.)

Sheppard was provisionally discharged on September 8, 1972, with a prognosis of "[g]ood,

provided medication regime is maintained." (*Id*.)  Although Sheppard did "quite well for about six

months," she became "maniacky" and hostile again and was readmitted to ASH on July 24, 1973.  (T.

267.)  The psychologist observed in the admission testing evaluation that Sheppard "can be very

pleasant and cooperative one minute and very hostile and demanding the next minute with apparently

very little external provocation." (T. 266.)  Sheppard was again discharged on May 9, 1974, when

"she suddenly announced that she was leaving, and could not be talked into staying any longer." (T.

263.)

In August 1974, Sheppard underwent a psychiatric exam at Hennepin County Medical Center

(HCMC).  She is described as "unable to tolerate usual social setting" and her ability to think, reason,

respond and relate, varied unpredictably.  (T. 257.)  On April 5, 1975, Sheppard was admitted to

Metropolitan State Hospital in Norwalk, California, for "alleged paranoid ideations." (T. 306.)  She

was under treatment for fourteen days and then was released into the care of her mother.  (T. 308.)

In 1976, at the request of the Social Security Agency (SSA) , Dr. J.C. Whitacre, conducted an

evaluation of Sheppard.  (T. 252.)  Dr. Whitacre concurred with the diagnosis arrived at by ASH.  (T.

253.)  Dr. Whitacre states that "[i]f what [Sheppard] says is true about her case [being closed at

General Hospital], and if she has gone through her pregnancy in reasonably good shape, then it would

appear that her psychosis is in a good degree of remission at present and that remission, as far as we

can see, is remaining stable."  (*Id*.)  Dr. Whitacre concluded that "[t]his young woman has stabilized . . .

, at least as much as can be determined from a single interview.  It would be expecting too much to

think that she would have no further problems."  (T. 254.)  Apparently, based on this report, the SSA

terminated Sheppard's SSI disability.  (T. 191.)

Sheppard was found disabled in July 1974 (T. 36) and received SSI benefits through June 1976.

(T. 191.)  In November 1975, Sheppard requested the agency cease her SSI benefits payments

because she was under the misimpression that the payments would interfere with her ability to receive

benefits under Minnesota AFDC (Aid for Families with Dependant Children).  (T. 200.)   In December

1975, after having been informed that she could retain both payments, Sheppard withdrew the request

and asked that benefits be reinstated.  (T. 202.)   In May 1976, the agency determined that Sheppard

had undergone a medical improvement and her SSI benefits were terminated.  (T. 190 - 91.)

6

Sheppard was married in 1977 and divorced in 1981. (T. 1094-95.) She has had six children.[2]
(T.1095-96.) Her parental rights had been terminated for all six children by June 1988. (T. 118, 319.)
She has never had substantial gainful activity. (T. 1099.)       The record contains numerous pages of
medical reports and notes, however, there is very little medical evidence from the relevant time period.
It appears that much of her treatment record from that period has been lost or destroyed. (T. 861.)
The few medical records that are in the record that are pertinent to the relevant time period are notes
from several emergency room visits from July 25, 1978 through April 7, 1989 (T. 356-385), a
psychiatric evaluation completed on June 1, 1988 (T. 314), and treatment notes from chemical
dependency treatment centers, which includes an additional psychiatric evaluation completed on
October 6, 1988 (T. 317-55). Dr. Hillida Wakefield, Sheppard's treating psychologist from the 1980s
submitted a psychological medical report, dated November 6, 2000, summarizing her recollections of
treating Sheppard. (T. 1070-72.) In addition, the record contains an August 1991 letter from a social
worker at Hennepin County Child Protective Services regarding Sheppard's use of the agency since
1971.

     According to the emergency room reports, Sheppard appeared at the emergency room for
various medical treatments including treatment for, *inter alia*, abdominal pain due to a "nervous
stomach," musculoskeletal pain, nasal congestion, sore heels and ankles, and minor trauma injuries to
the head and neck resulting from an assault by a female acquaintance. The records fail to discuss any

---

[2]       Sheppard's children were born in 1976, 1977, 1981, 1982, 1986, and 1987. (T.
1095-96.) At the time of the administrative hearing in 2001, all but the two youngest children were
over the age of eighteen. (T. 1096.) The two younger children were in foster care. (*Id*.)

psychological or mental health issues.  (*See* T. 356-85.)

A psychiatric evaluation was completed on June 1, 1988, by licensed psychologist Paula Villegas.  (T. 314.)  Dr. Villegas saw Sheppard for three 50-minute sessions and administered the MMPI.[3]  (*Id.*)  According to Dr. Villegas, the results from the MMPI indicate that Sheppard is a "very angry person, who is primarily expressing this anger in passive aggressive ways."  (T. 315.)  Dr. Villegas determined that Sheppard was suffering from an alcoholism/chemical dependency disorder.  (*Id.*)  Villegas explained, however, that "it is common for alcoholics to produce dysfunctional MMPI scales that clear significantly after treatment."  (*Id.*)  Villegas concluded that Sheppard's prognosis was guarded, but suggested that this prognosis could possibly change with successful treatment of Shepperd's chemical dependency.

Sheppard was admitted to the Anoka-Metro Regional Treatment Center (Anoka-Metro) on June 3, 1988 and left the treatment center without staff approval on June 11, 1988.  (T. 317.)  She was admitted to the Fergus Falls Regional Treatment Center (Fergus Falls)  residency program on September 7, 1988, and was discharged on September 21, 1988.  (T. 327.)  At the time she was admitted to these programs, she was involved in a custody dispute with the county over her children.  (*See* T. 319, 327.)  The centers' treatment notes comment on her chemical dependance on alcohol and marijuana.  (T. 317, 332.)

The treatment notes from Anoka-Metro indicate that she was "rather noncompliant with the

---

[3]     The Minnesota Multiphasic Personality Inventory (MMPI) is a test frequesntly used by mental health professionals to evaluate the social, behavioral and personal problems of psychotic patients.  *Wikipedia, The Free Encyolpedia* at http://en.wikipedia.org/wiki/Minnesota_Multiphasic_Personality_Inventory.

treatment program."(T. 319.)  The discharge summary indicates a poor prognosis "due to [the] patient leaving treatment and her low motivational level."  (*Id*.)  Probable bipolar affective disorder is listed as a diagnosis in her Anoka-Metro medical history and physical examination report.  (T. 318.)

Treatment notes from Fergus Falls describe Sheppard as intelligent and "motivated for change" and indicate a history of psychiatric problems. (T. 327.)  According to the admission report, she reported no psychiatric treatment since 1973.  (T. 330.)  The report notes that, although Sheppard was hospitalized for a mental illness when she was sixteen years old, "she says she now recognizes the behavior that was going on at that time as being part of her drinking pattern."  (T. 332.)  Her mental status is described as her affect being somewhat flat, her mood depressed, and that she was "very talkative and quickly changed from subject to subject, sometimes without completing her thought."  (T. 333.)  The report further indicates, however, that she was "cooperative and pleasant throughout the interview."  (*Id.*)  The diagnosis is listed as: "Alcoholism and cannabis abuse.  Rule out personality disorder and mood disorder."  (T. 334.)

A psychiatric evaluation, completed by a licensed consulting psychologist, Dorothy Sperling-Quaal, on October 6, 1988, notes that Sheppard exhibited "a low frustration tolerance and occasionally under stress can become very hyperactive."  (T. 343-44.)  Sperling-Quaal reported that those at the clinic had "observed an exaggeration of [Sheppard's] symptoms in order to gain attention and support from others."  (T. 343.)  Sperling-Quaal also reported that, according to the MMPI profile, Sheppard was "experiencing significant psychological distress and lack[ed] sufficient ego strength to cope with her current problems."  (*Id*.)

Dr. Wakefield submitted a psychological medical report dated November 6, 2000, based on

her recollection of treating Sheppard for several months in the early 1980s.  Wakefield explained that

she no longer had records for Sheppard, but that she remembered her very clearly.  (T. 1070.)  Dr.

Wakefield described Sheppard as having an abrasive personality, "easily angered, prone to resentments

[and] hostility, and difficult to get along with."  (T. 1070.)  She related that Sheppard was taking care of

her young children at that time and that she did not recall any restrictions on Sheppard's activities of

daily living.  (T. 1070-71.)  Dr. Wakefield noted that, at that time, Sheppard was able to remember,

comprehend, and carry out simple or complex instructions on an independent basis.  (T. 1071.)  Dr.

Wakefield also noted, however, that at the time of her treatment, Sheppard was unable to respond

appropriately to work pressures, supervisors, and co-workers.  (*Id*.)

Audrey D. Saxton, a social worker from Hennepin County Community Services Department,

Child Protection Division, wrote a letter in August 1991, supporting Sheppard's application for SSI

benefits.  (T. 1076.)  Saxton noted that Sheppard had been a client of the agency since 1971.  (*Id*.)

She also noted that Sheppard had "received services from Child Protection since 1976 due to her

mental illness, bi-polar disease, and her character disorder."  (*Id.*)  Saxton described Sheppard as

"unable to live independently without jeopardizing her own health and welfare."  (*Id*.)  Saxton stated

that Sheppard's ability to function was "emotionally and socially precarious at best."  (*Id*.)

In November 1991, Sheppard was found screaming in the streets, had not slept for two days,

and was having delusions about special powers that she possessed.  (T. 393.)  She was diagnosed with

bipolar disorder manic with psychotic features.  (*Id*.)  It was recommended that she be placed in long

term treatment at a closed psychiatric facility.  (*Id*.)  Based on this report and other similar reports, as

well as testimony by medical expert Dr. Jacobson, ALJ Martinez found that Sheppard's impairments

were of sufficient severity for Sheppard to be presumed disabled under the criteria for the listed

impairment section 12.08 (personality disorders).  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, §

12.08.  ALJ Martinez explained that Dr. Jacobson, the medical expert, testified at the administrative

hearing that Sheppard suffered from "inflexible and maladaptive personality traits which have caused

significant impairments in social and occupational functioning."  (T. 28.)

## IV.   TESTIMONY AT ADMINISTRATIVE HEARING

On October 12, 2001, a hearing was held before ALJ Townsend-Anderson.  (T. 1077.)

Sheppard was present, testified, and represented by non-attorney Judith Martin.  (*Id*.)  Dr. Karen H.

Butler testified as a medical expert and Norman A. Mastbaum testified as the vocational expert.  (*Id*.)

Sheppard testified about her admissions to Anoka State Hospital in the early 1970s.  (T.

1086.)  She also testified about her being taken diagnosed in 1990 or 1991 with bipolar affective

disorder.  (T. 1091.)  She told the ALJ that she had not worked during the 1980s because she was

taking care of her children.  (T. 1097, 1112.)  Sheppard also explained that when she had tried to

work, she got "stressed out" and could not handle the stress.  (T. 1099.)  She stated that her mental

difficulties were worst before she turned eighteen years old and then again more recently, close to the

time of the hearing.  (T. 1109.)  She said that she was not hospitalized nor was she on any medication

for mental problems from 1976 through 1991.  (T. 1114.)  She stated, however, that she had been

seen by a couple of psychologists during that time period.  (T. 1114-15.)  Throughout her testimony,

Sheppard had difficulty in answering some questions in a direct and concise manner.  (*See* T. 1086-

1114.)

Following Sheppard's testimony, Dr. Butler explained that although Sheppard had been

11

diagnosed with two conditions, bipolar affective disorder and schizo affective disorder, this is actually a single diagnosis based on the same symptoms. (T. 1121.) She noted that schizo affective disorder is no longer a recognized diagnosis. (*Id*.) Accordingly, Dr. Butler confirmed a diagnosis of bipolar affective disorder from 1974 through the present. (T. 1122.) Dr. Butler stated that Sheppard's symptoms satisfied the A criteria for 12.04[4] (affective disorders) and 12.08[5] (personality disorders). (T. 1122-23.) Dr. Butler determined that the B criteria were: (1) moderate restriction of activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) seven periods of decompensation, with durations ranging from four to eight months. (T. 1123.) Dr. Butler also determined that the evidence did not establish the presence of any C criteria. (*Id*.) Finally, Dr. Butler determined that Sheppard's impairments did not meet the listed impairments because she has not had a continuous 12-month period where the impairments met the necessary severity. (T. 1124.)

Dr. Butler concluded that Sheppard would be restricted to work that would (1) be routine and repetitive, (2) involve brief and superficial contact with others, and (3) have minimal to moderate standards of production. Dr. Butler also added that it would be beneficial if Sheppard were limited to work in an alcohol-free environment. (*Id*.)

---

[4]      "Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R. § 404, App. 1, Subpart P, 12.04.

[5]      "A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness." 20 C.F.R. § 404, App. 1, Subpart P, 12.08.

Following Dr. Butler's testimony, the vocational expert Mastbaum testified about jobs available

in the economy in the 1980s.  The ALJ posed the following hypothetical to the ALJ:

> Assume you have an individual who is age 22, who has a GED, who has no
> prior relevant work experience. . . . Who has a personality disorder, and diagnosed
> with bipolar with psychotic features, who also suffered from alcohol abuse.  Who is
> limited to lifting and carrying 50 pounds occasionally, 25 pounds frequently.  Who
> could do work that was routine and repetitive un nature.  Who could do work that
> allowed for a brief and superficial contact with others.  Who could do work that
> requires only minimal to moderate standards of production and pace.  And who has to
> work in an alcohol free environment.

(T. 1127-28.)  Based on the hypothetical posed by the ALJ, Mastbuam stated that there would have

been approximately 1,500 jobs as a machine attendant; 2,000 car wash attendant; and 1,000 as a

warehouse laborer.

The ALJ then modified the hypothetical to limit the individual to carrying 20 pounds

occasionally and 10 pounds frequently.  Mastbaum replied that the job of a car wash attendant would

still be appropriate and the number would remain the same.  He explained that while the warehouse

attendant would no longer apply due to its categorization as medium work, a bagger within the power

sewing machine industry would be appropriate and would have had approximately 3,000 jobs in the

1970s.  In addition, he noted that a laundry worker would also be appropriate, with a number of

available jobs at 3,000.

Based on Sheppard's statement that she suffered from asthma induced by exercise or stress,

the ALJ modified her hypothetical again to include restrictions on temperature and humidity extremes

and no airborne irritants or smoke or fumes.  The vocational expert stated that this would rule out

laundry worker, but would still leave approximately 2,000 available jobs as baggers.

13

**V.      THE ALJ'S FINDINGS AND DECISION**

On December 11, 2001, ALJ Townsend-Anderson issue her decision, denying Childhood Disability Benefits.  In determining Sheppard's disability, the ALJ followed the sequential five step procedure as set out in the rules.  *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a).  The Eighth Circuit has summarized these steps as follows:

> The Commissioner must determine: (1) whether the claimant is presently engaged in "substantial gainful activity;" (2) whether the claimant has a severe impairment--one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity [RFC][6] to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Fines*, 149 F.3d at 895 (footnote added).

Because Sheppard claimed limitations based on a mental impairment, the ALJ subsequently proceeded through the additional steps as outlined in § 404.1520a and § 416.920a.  According to these sections, the ALJ must rate the claimant's degree of limitation in four broad functional areas.  § 404.1520a(c)(3); § 416.920a(c)(3).  These four areas are: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  *Id.*  The ALJ must rate the degree of limitations on a five-point scale: None, mild, moderate, marked, and extreme.  §

---

[6]      A claimant's RFC is the most the claimant can still do despite the claimant's physical and/or mental limitations.  20 C.F.R. § 404.1545.

404.1520a(c)(4); § 416.920a(c)(4).  If by using these ratings the ALJ determines that the impairment is severe, but does not meet a listed impairment, the ALJ must assess the claimant's RFC as described in step four of the determination procedure. § 404.1520a(d)(3); § 416.920a(d)(3).

Based on the above regulations and her review of the evidence in the record, the ALJ determined that Sheppard met the requirements for the first three steps of the disability determination procedure.  Specifically, the ALJ found that Sheppard was subject to severe physical impairments of asthma, diabetes, and scoliosis, but that the severity was not sufficient to meet any section of the Listed Impairments.  The ALJ additionally found that Sheppard was subject to mental impairments of an affective disorder, personality disorder and substance addiction disorder.  The ALJ determined that these impairments caused Sheppard to have (1) moderate restrictions on activities of daily living, (2) marked difficulties in maintaining social functioning, (3) moderate difficulties in maintaining concentration, and (4) moderate difficulties in maintaining concentration, persistence and pace.  The ALJ also determined that Sheppard had four or more episodes of decompensation.  Based on those determinations, the ALJ concluded that Sheppard's mental impairments were sever and met the requirements of the Listed Impairments in Sections 12.04, 12.08, and 12.09.

Following the agency regulations at 20 C.F.R. §§ 404.1535(b) and 416.935(b), the ALJ determined that Sheppard's drug and alcohol addition were contributing factors in the severity of her impairments.  (T. 18.)  In reviewing Sheppard's impairment absent the contributing impairment of her alcohol and drug dependency, the ALJ determined that Sheppard was still subject to the same severe physical impairments and the mental impairments of affect disorder and personality disorder.  The ALJ determined that, absent her chemical dependency impairments, Sheppard had (1) moderate restrictions

on her activities of daily living; (2) moderate difficulties in maintaining social functioning; and (3) moderate difficulties in maintaining concentration, persistence, and pace.  The ALJ also determined that Sheppard did not experience repeat episodes of decompensation.  Based on these findings, the ALJ concluded that Sheppard's impairments, without considering her impairments caused by her chemical dependency, did not meet or equal any of the Listed Impairments.

The ALJ then proceeded to evaluate Sheppard's RFC.  She considered the opinion of Dr. Wakefield and restricted Sheppard to work that limited contact with others and that was routine and repetitive.  (T. 20.)  The ALJ limited Sheppard to only occasionally lifting fifty pounds based on her diagnosis of asthma, scoliosis, and diabetes.  The ALJ noted, however, that the record indicated minimal treatment for physical impairments during the relevant period.  (T. 20.)  The ALJ further considered the opinion of the testifying medical expert, Dr. Butler.  Based on Dr. Butler's testimony, the ALJ determined that Sheppard has periods of severe impairments, but that the periods were not of long duration.  (T. 21.)  The ALJ noted that none of Sheppard's treating physicians had placed restrictions on her ability to work.  (T. 21.)  She found that Sheppard's subjective complaint were not fully credible, based on other medical evidence in the record and evidence of Sheppard's daily activities. (T. 21.)  Based on these factors, the ALJ found that Sheppard retained the following RFC: "[Sheppard] could perform only routine, repetitive work; she could tolerate only brief and superficial contact with others; she could perform at only the minimum to moderate standard of production; and she could lift and carry a maximum of twenty-five pounds frequently and fifty pounds occasionally."  (T. 20.)

Based on this RFC and the testimony of the vocational expert, the ALJ found that Sheppard

retained the capacity to adjust to work that existed during the relevant period in significant numbers in the national economy. (T. 22.) The ALJ concluded that Sheppard was not disabled during the relevant period, accordingly, had not demonstrated a continuing disability since age 22, and was not entitled to Childhood Disability Benefits.[7] (T. 22.)

## VI.   DISCUSSION

### A.      Standard of Review

This court will affirm the ALJ's findings that the claimant was not under a disability if the findings are supported by substantial evidence based on a review of the entire record. *Haley v . Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support the decision." *Id.* (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). The review the court undertakes, however, must go beyond solely the examination of the record for evidence in support of the Commissioner's decision. *Id.* The court must additionally examine the record for evidence that detracts from that decision. *Id.* Nevertheless, as long as there is substantial evidence to support the decision, this court will not reverse it simply because substantial evidence exists in the record that would support a contrary outcome or because this court might have decided differently. *See id.*

### B.      Analysis of Decision

The ALJ determined that Sheppard met the criteria for sections 12.04, 12.08 and 12.09, of the

---

[7]      The ALJ found that Sheppard had previously been determined disabled after 1991. (T. 21.) This is incorrect as Sheppard had previously been found disabled as of September 12, 1989. (T. 27.) The ALJ's finding that Sheppard was not disabled from September 12, 1989 through March 12, 1991 is clearly inaccurate and contrary to the law of the case. (*See* T. 29.)

Listed Impairments in Subpart P, Appendix 1, which would qualify Sheppard for a presumed disability. However, the ALJ next determined that absent Sheppard's impairments caused by alcoholism and chemical dependency, Sheppard's limitations did not meet the criteria for a Listed Impairment and that she would have been able to perform jobs with significant numbers in the national economy. Sheppard argues that the ALJ failed to give the proper weight to the opinions of Sheppard's treating physician, failed to follow proper principles of law with respect to Sheppard's chemical dependancy, failed to follow proper principle of law in determining Sheppard's credibility, and failed to include all of Sheppard's impairments in the hypothetical posed to the vocational expert. (Pl. Mem. at 8.)  The Commissioner argues that the ALJ properly applied the law in determine that Sheppard was capable of performing substantial gainful activity for the relevant time period and that the ALJ's decision is supported by substantial evidence in the record. (Def. Mem. at 1.)

<div align="center">

1.    Weight Given to Treating Psychologists Opinion

</div>

Generally, under the Social Security Agency regulations, more weight is given to a medical expert's opinion who has examined the claimant, than to an opinion from one who has never examined the claimant, but render an opinion based on a review of the record. 20 C.F.R. § 404.1527(d)(1). More weight is given treating sources "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." Controlling weight must be given to the opinion of a treating physician if "it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."

20 C.F.R. § 404.1527(d)(2).  If the treating source opinion is not given controlling weight, because of

the lack of objective medical testing or inconsistency with other substantial evidence in the record, then

the Social Security Agency has set forth certain criteria that must be considered when determining what

weight should be afforded the treating source's opinion.  *See id.*  These factors include, *inter alia*,

length, nature, and extent of the treatment relationship.    20 C.F.R. § 404.1527(d)(2)(i) & (ii).

Due to the loss and destruction of Sheppard's medical records, there is minimal evidence in the

record of Sheppard's mental impairments during the relevant period.  Sheppard was able to locate her

treating psychologist from that period, Dr. Wakefield, and submitted a recent report from her.   Dr.

Wakefield stated that, in the 1980s, she treated Sheppard for many months and had seen her on a

weekly basis.  (T. 1070.)  She explained that although the records from that time had been destroyed,

she was able to recall Sheppard very clearly and fully remembered her treatment.  (*Id.*)  She stated that

Sheppard's problems predated Sheppard's first contact with her.  (*Id*.)  She described Sheppard as

"prone to resentment and hostility and difficult to get along with."  (T. 1070.)  She also explained that

her abrasive personality would make it difficult for her to work with others.  (*Id*.)  She recalled that

there had been no restrictions on Sheppard's daily activities during that period.  (T. 1071.)  She stated,

however, that at the time of her treatment, Sheppard was unable to respond appropriately to work

pressure, supervision and co-workers.  (*Id*.)  She explained that Sheppard "responded to pressure with

anger, temper outbursts and resistence."  (*Id*.)  Dr. Wakefield asserted that personality disorders, such

as the one Sheppard suffered from, tended to be long-lasting.  (*Id*.)

Despite the ALJ's notation of Dr. Wakefield's opinion about the strict limitations on

Sheppard's ability to work or socialize with others, the ALJ based her determination that Sheppard had

only moderate limitations on her ability to function socially on the testimony of Dr. Butler and the ALJ's

conclusion that Sheppard's children had been removed from her care mainly due to alcoholism.  (T.

19.)   Whereas Dr. Wakefield's opinion should not necessarily be granted controlling weight, due to the

lack of diagnostic testing or objective medical evidence preserved in the record, considerably weight

should be given to this opinion based of the length and nature of Dr. Wakefield's treating relationship

with Sheppard, Dr. Wakefield's speciality in the field of psychology and the fact the Dr. Wakefield's

opinion is consistent with other contemporaneous evidence in the record.  *See* 20 C.F.R. §

416.927(d)(2).  Dr. Butler's opinion, contrarily, should have been granted less weight due to the fact

that Dr. Butler never examined Sheppard.  *See* 20 C.F.R. § 416.927(d)(3).  Additionally, Dr. Butler's

opinion should have been granted less weight because she failed to provide a reason or explanation

why she discounted the treating physician's evaluation or on what evidence in the record she based her

decision to place only moderate restrictions on Sheppard's ability to function in a social setting.  *See id.*

("[B]ecause nonexamining sources have no examining or treating relationship with the claimant, the

weight that the agency will give their opinions will depend on the degree to which they provide

supporting explanations for their opinions.").

Furthermore, there is little evidence in the record for the ALJ's conclusion that Sheppard's

parental rights were terminated due mainly to Sheppard's alcoholism.  (*See* T. 19.) The evidence cited

for this conclusion, an evaluation from the Fergus Falls Treatment Center, does not support this

determination.  (*See* T. 335.)  Nor is there any other evidence in the record which demonstrates that

Sheppard's children were removed fro her care based solely on her alcoholism.  In fact, a social

worker from Hennepin County stated that Sheppard was receiving services from child Protection based

on her mental illness, not her chemical dependency.  (T. 1076.)  Additionally, Sheppard states that

there was a long goal list that she was supposed to accomplish before her children would be returned to

her.  (T. 1112.)  Furthermore, even though Sheppard stopped drinking in 1988, she never regained her

parental rights to any of her children.  Thus, the ALJ's finding that Sheppard's children were removed

due mainly to alcoholism is not supported by substantial evidence.  It appears from the record that they

were removed for multiple reasons, only one of which may have been Sheppard's alcoholism.

Accordingly, the ALJ's determination that, absent her alcoholism, Sheppard would have had

moderate difficulties in maintaining social functioning is not based on substantial evidence. Limitations of

maintaining social functioning are particularly important in determining a claimant's RFC, because a

claimant's RFC is based on the "ability to perform the requisite . . . acts day in and day out, in the

sometimes competitive and stressful conditions in which real people work in the real world."  *McCoy v.*

*Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982).

2.     The ALJ's Determination of Sheppard's Credibility

Sheppard also claims that the ALJ failed to properly assess her subjective complaints and

properly take those complaints into consideration when posing the hypothetical to the vocational expert.

In determining the credibility of a claimant's subjective complaints, the ALJ looks to several factors as

set out in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984).  These factors include: daily activities;

duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and

aggravating factors; and functional restrictions. *Id.* at 1322.  These factors must be considered in the

light of "the claimant's prior work record, and observations by third parties and treating and examining

physicians."  *Id.*

21

Although the ALJ recites the *Polaski* factors, she fails to assess Sheppard's subjective complaints with respect to her inability to function in stressful situations. Here, Sheppard's description of her limitations during the relevant period are consistent with other evidence in the record. For example, Sheppard claims that her children were removed from her care due to the stresses caused be her mental illness. (T. 1084.) Three of her children were removed from her care before they were two years old. (T. 1112-13.) One of her children was removed while still an infant. (T. 1112.) In addition, Sheppard explained that she was never able to hold down a job because she "got to stressed out" and could not "handle the stress." (T. 1084.) Sheppard's work history, or lack thereof, also supports Sheppard's complaints of a total inability to handle stress. Sheppard states that she tried various types of jobs, but was unable to keep these jobs. (T. 1115.) The inability to handle stress is also consistent with Dr. Wakefield's assessment that Sheppard was unable to deal with stressful situations. This also is consistent with the opinion of Saxton, the Hennepin County Community Services social worker, that Sheppard was emotionally unable to even take care of herself during this time period. Although Dr. Wakefield did state that Sheppard had no limitations on her daily activities, she stressed that Sheppard was not able to withstand the pressures relating to a work setting. Sheppard's subjective complaints are consistent with this opinion. Sheppard describes a minimal ability to function on a daily basis (for example doing some craft work, watching movies, etc.), but also describes her frequent attempts to hold down a job or attend school and her resulting inability to do either for more then a few days or a couple fo weeks due to the pressures of working or attending class. Accordingly, the court finds that the ALJ failed to properly assess Sheppard's subjective complaints regarding her inability to function in stressful situations.

In addition, the ALJ's determination that none of Sheppard's treating psychiatrists had placed work restrictions greater then those imposed by the ALJ's RFC is not supported by the record.  Dr. Wakefield clearly expressed the opinion that Sheppard would not be able to withstand the pressures associated with the workplace.  This is contrary to the ALJ's RFC.

3.     The ALJ's Analysis of the Effect of Sheppard's Chemical Addition

Sheppard argues that the ALJ misapplied the rules regarding the evaluation of a claimant's limitations when that claimant exhibits impairments caused by chemical dependency.   According to the regulations:

> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
>> (i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. §§ 404.1535(b) and 416.935(b).

The ALJ followed the proper procedure for determining the claimant's RFC without the limitations imposed by the claimant's alcohol and chemical dependency impairments, by first finding that Sheppard's impairments were disabling and then determining whether her impairments absent the alcoholism were disabling.  The ALJ's failure, however, to grant the proper weight to the treating

physician's opinion with respect to Sheppard's impairments and to take into account Sheppard's

subjective complaints that were supported by the record, rendered the ALJ's determination of

Sheppard's RFC absent the alcohol and chemical dependency faulty.


4.      The Hypothetical Posed to the Vocational Expert

The ALJ's determination of Sheppard's limitations as set forth in her RFC was not properly

determined and supported by substantial evidence in the record as a whole.  Accordingly, the

hypothetical, based on the improper RFC, is also not supported by substantial evidence.  *Shontos v.*

*Barnhart,* 328 F.3d 418, 427 (8th Cir. 2003) (noting that the testimony of a vocational expert who is

responding to a hypothetical that is not based on substantial evidence cannot be used by the ALJ to

make a determination of non-disability.).

## VII.    CONCLUSION AND RECOMMENDATION

Based on the foregoing discussion, the court concludes that there is not substantial evidence

supporting the ALJ's decision finding that Sheppard failed to meet the criteria for disability insurance

benefits under the regulations of the Social Security Agency.  In addition, the court finds that there is

substantial evidence to support a finding a disability.  Accordingly, the court **recommends** that

Sheppard's Motion for Summary Judgment [Docket No. 18] **be denied** and the Commissioner's

Motion for Summary Judgment [Docket No. 21] **be granted**.  The court further recommends, based

on substantial evidence in the record, that the matter be **reversed and remanded** solely for the

granting of benefits.  *See Cunningham v. Apfel*, 222 F.3d 496, 503 (8th Cir. 2000).

Dated: <u>November 14, 2005</u>

<div style="margin-left: 50%;">
<u>s/ Arthur J. Boylan</u>

Arthur J. Boylan

United States Magistrate Judge
</div>

### NOTICE

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **November 30, 2005.**